Victor Duke Hamilton, Jr., the appellant, was convicted for the murder of Elaine Norton and was sentenced to a term of life imprisonment. Our review supports the findings of the trial court. The appellant's conviction should be affirmed.
 I.
The appellant contends that his statements to the police were taken in violation of his constitutional rights. He argues that the Miranda warnings given by the police advising him that he was entitled to have an attorney appointed to be with him during questioning was not an "effective and express explanation" of his right to counsel. Appellant also maintains that he invoked his right to counsel and that, at that point, all questioning of him should have ceased.
The appellant was hospitalized at the University of Alabama Hospital in Birmingham on September 2, 1984. He was receiving treatment for a drug overdose after an apparent suicide attempt, which had occurred on August 29, 1984. He was subsequently transferred to the psychiatric ward of the hospital. During his stay in the psychiatric ward, the appellant made an incriminating statement to Dr. Shory, one of the doctors treating him. He told Dr. Shory that he had beaten a girl with whom he had been living, allegedly in self-defense. Appellant's mother later informed Dr. Shory that on September 1, 1984, appellant's girlfriend had been found dead. Dr. Shory, at that time, called Sgt. Kines of the Vestavia Hills Police Department and told him that he could talk with the appellant and that the appellant was capable of talking to the police. Thereafter, Sgt. Kines visited appellant at the hospital. Upon his arrival, appellant greeted Sgt. Kines by saying, "Hi Joe, I — guess I have screwed up, haven't I?" At this point, Sgt. Kines read the appellant his rights from his Miranda card. The appellant then stated that he understood those rights and that he could not afford an attorney. Sgt. Kines told him that if he requested an attorney, there would be no questioning until the attorney was present. The appellant then asked Sgt. Kines whether or not he needed a lawyer. Sgt. Kines stated he could not advise appellant as to his need for counsel; however, he told appellant he was entitled to an attorney prior to giving a statement. Appellant then indicated that he had better talk to an attorney and Sgt. Kines said "okay."
Immediately thereafter, the appellant said "I did not go to that house with the intent to hurt that girl." Sgt. Kines interrupted the appellant and told him again that he did not want to violate the appellant's rights and that he had already said he wanted an attorney. Sgt. Kines again told the appellant that he wanted him to understand his rights. The appellant replied that he wanted to make sure he could tell him the whole truth. Then Sgt. Kines again asked whether he wanted to talk about the incident without an attorney and the appellant said he wanted to tell as much of it as he could "right now." Sgt. Kines again asked appellant if he wanted to do this without an attorney present and appellant answered "yes." The conversation was as follows:
 "Q. Having these rights in mind, do you wish to talk to us with or without an attorney? Just to be — I can't hire you an attorney. This is what I usually do, Vick. If you decide that you don't want to talk to me *Page 333 
unless there is an attorney present, well then, all I want you to tell me is that you don't want to talk to me until you have an attorney present. And then we will cut it off, Buddy, and that will be it. I mean, it is just as simple as that because I don't want to do anything to violate any rights that you might have.
"A. Do you think I should have an attorney?
 "Q. I can't tell you that either, Victor. All I can tell you is that if you want one, then all I am going to do is just say that Victor wants to have an attorney present before he gives us a statement.
"A. I think I better talk to an attorney.
"Q. Okay.
 "A. I did not go to that house with the intent to hurt that girl. A confrontation took place between me and that girl. But it was not initiated by me.
 "Q. Victor, I want you to understand now, don't do anything to violate your rights, now. You already told me you want to talk to an attorney.
 "A. I am just droggy [sic] now and I want to make sure that everything I say is correct.
 "Q. I understand that. But I want you to understand also that you are under protective custody here at the hospital. You understand that?
"A. Yes.
 "Q. And I want to make sure that you thoroughly understand your rights.
 "A. Okay. And I just want to make sure that I am coherent enough to tell you the whole truth without leaving anything out —
 "Q. Do you want to do this without an attorney present?
"A. Yes."
(R. 745-746).
Thereafter, Sgt. Kines took a statement wherein the appellant admitted striking the victim with a hammer several times. However, he denied that he initiated the violence. "[A] request for counsel acts as an absolute prohibition on the right of police to initiate questioning until an attorney has been appointed." United States v. Bosby, 675 F.2d 1174 at page 1182. (Emphasis added.) Judge Johnson, writing for the Eleventh Circuit Court of Appeals in May, 1982, in Bosby, supra, citedEdwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, at 1182,68 L.Ed.2d 378 (1981) addressing the issue now before this court:
 "11. Edwards does not, however, stand for the broad proposition that every statement made by a defendant after invoking his right to counsel will always be inadmissible. For example, where a defendant initiates the conversation that leads to incriminating statements, the statements are admissible. Edwards v. Arizona, 451 U.S. at 483, 101 S.Ct. at 1884, 68 L.Ed.2d at 387; Accord, United States v. Webb, 633 F.2d 1140, 1142 (5th Cir. 1981); Foster v. Strickland, 517 F. Supp. 597, 606 (S.D.Fla. 1981). Edwards merely prohibits law enforcement officials from initiating an interrogation prior to the time defendant receives an attorney." (Emphasis added.)
The following principles are set out in Smith v. Illinois,469 U.S. 91, 105 S.Ct. 490, at 492-93, 83 L.Ed.2d 488 (1984):
 "An accused in custody, `having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him,' unless he validly waives his earlier request for the assistance of counsel. [Citing Edwards.] This `rigid' prophylactic rule . . . embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. See, e.g., Edwards v. Arizona, . . . (whether accused `expressed his desire' for, or `clearly asserted' his right to, the assistance of counsel); Miranda v. Arizona, 384 U.S., at 444-45, (whether accused `indicate[d] in any manner and at any stage of the process that he wish[ed] to consult with an attorney before speaking'). Second, if *Page 334 
the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."
This court has ruled many times that a defendant's rights are not violated when, after a request for counsel, the defendant initiates the conversation which results in the incriminating statements being used against the appellant.[1]
The pivotal issue is whether the suspect himself initiated the conversation and right he had invoked by the request for knowingly and intelligently waived the counsel. Judge Bowen accurately framed the issue now before this court in McCall v.State, [Ms. May 27, 1986, 1 Div. 895] (Ala.Cr.App. 1986), in stating:
 "[W]hen a suspect has requested counsel, the interrogation must cease unless the suspect himself initiates the conversation. Although interrogation may not continue, the police legitimatley may inquire whether the suspect has changed his mind about speaking to them without an attorney. Moulds v. State, 429 So.2d 1176, 1187 (Ala.Cr.App. 1983). `Miranda does not erect "an absolute per se bar on any conversation with the accused by investigating officers after the former has requested counsel. It only inhibits investigative interrogation related to the specific crime itself." United States v. Grant, 549 F.2d 942, 946 (4th Cir.), cert. denied, 432 U.S. 908, 97 S.Ct. 2955, 53 L.Ed.2d 1081 (1977).' Dunkins v. State, 437 So.2d 1349, 1352 (Ala.Cr.App.), affirmed, Ex parte Dunkins, 437 So.2d 1356 (Ala. 1983). `When police stop interrogation as required, admissions that later come at the initiative of a suspect are subject to the traditional analysis for voluntariness. * * * The same principle governs when, as here, a suspect who has been informed of his rights expresses both a desire for counsel and a desire to continue the interview without counsel. Where the suspect's desires are expressed in such an equivocal fashion, it is permissible for the questioning official to make further inquiry to clarify the suspect's wishes.' Nash v. Estelle, 597 F.2d 513, 517 (5th Cir. 1979)." (Emphasis added.)
The trial court enumerated its findings of fact regarding the appellant's right to counsel as follows:
"In summary, the court finds:
 a. that defendant made an `equivocal' request for counsel that Sgt. Kines terminated the questioning at the point that defendant made his invocation
 c. that defendant made an unsolicited inculpatory statement, i.e., that defendant initiated a further exchange between [him] and Kines
 d. that Kines next endeavored to clarify defendant's request for counsel as juxtaposed against defendant's apparent wish to waive counsel and make a full statement, that the further questioning by Kines up to the point of the waiver was limited to clarifying defendant's wishes re counsel
 e. that having resolved that defendant knowingly and intelligently wished to waive counsel and make a statement then and for the first time does Kines begin to interrogate the subject by first asking him when he had seen the deceased. *Page 335 
 The court concludes that defendant Hamilton `colored' his request for counsel when in his next breath he implicated himself by initiating a further exchange between [him] and Sgt. Kines, that Kines appropriately engaged in an exchange limited to clarifying defendant's request for counsel and that only upon defendant's informed waiver did Kines question the defendant." (R. 749)
It is apparent that after initially giving him his Miranda
warning Sgt. Kines explained several times right to have an attorney present several times. The record supports the finding that appellant understood his right to counsel, but, after deliberation, waived that right.
The trial court correctly found that appellant not only initiated the further communication after the request for counsel, but also waived his right to counsel that he had equivocally invoked prior to making the incriminating statements. We find no violation of the appellant's right to counsel; thus, appellant's argument must fail.
 II.
Appellant maintains his statement was involuntary and should be suppressed because, he says, at the time his statement was given, his mind was substantially impaired. Appellant argues that, based upon the totality of the circumstances, he did not make an intelligent waiver of his right to counsel. In support of his argument, he lists thirteen reasons that he says show his will was "overborne" at the time he confessed; thus, he says, the confession was the product of irrational intellect and not of a free will:
 "1. In the confession itself, at least one-half of Defendant's answers are inappropriate, unresponsive and made with hesitation and waiver. He could not recall details, times or places in chronological order. (R. 505-524.)
 "2. Defendant had attempted suicide some forty-eight hours prior to the confession and high doses of Tylenol and Valium and the antidotes were still in his system.
 "3. Defendant had, within the last seventy-two hours, been diagnosed as having major depression (R. 542) and the doctor had recommended hospitalization. At University Hospital he varied from apathetic and confused to extremely loquacious.
 "4. In the last seventy-two hours the Defendant had been `so tired [I] wanted to help him walk' etc., (R. 435), appearing weak-looking and depressed.
 "5. At the taking of the confession, Defendant was in a mental ward on one-to-one suicide prevention watch (R. 483); it was 3:00 a.m.; and he had been some twenty hours without sleep.
 "6. The Defendant had recently quit his job of twelve years as a Hoover fireman. (R. 435)
 "7. The Defendant had recently been served with legal papers pertaining to a paternity suit and was afraid for his life. (R. 142) (R. 436)
 "8. The Defendant could not pronounce simple words, his voice itself showed strain; `Droggy' for groggy or drowsy. (R. 506) (Confession tape.)
 "9. Defendant apparently set himself on fire during the confession. (R. 510)
 "10. Defendant knew Sgt. Kines and considered him more as an advisor and friend than a police officer there to question him about a murder. (R. 505-506.)
 "11. Defendant was shocked and stunned, having just learned that the girl he had lived with was dead, and that he was in effect a murderer.
 "12. As recent as seventy-two hours before the confession (Thursday evening, August 30), Defendant had been so confused and disoriented that he did not even know what day it was. (R. 438.)
 "13. Although these facts were not known to the jury, the whole record shows, and the Judge knew, that the Defendant was then under the care of a psychiatrist and had been for some time and that he had attempted suicide the previous year and had been confined to *Page 336 
the psychiatric ward at Brookwood Hospital."
Appellant's brief at 21-22.
Appellant maintains that because of the thirteen reasons cited above, he did not have the mental and emotional stability necessary to make a knowing and intelligent waiver of his known rights. He argues that considering the totality of the circumstances and pursuant to Minor v. State, 437 So.2d 651
(Ala.Cr.App. 1983), the appellant's statement should have been excluded. However, it is this court's duty to accord the trial court's determination great weight in deciding upon the voluntariness of a confession, and that determination is not to be overturned unless it is palpably contrary to the weight of the evidence. Carter v. State, 53 Ala. App. 43, 297 So.2d 175, (1974); Boggan v. State, 455 So.2d 228 (Ala.Cr.App. 1984);Bentley v. State, 450 So.2d 197 (Ala.Cr.App. 1984).
Edwards v. Arizona, supra, is instructive on the voluntariness issue. The trial court cited to Edwards in addressing the voluntariness issue:
 "Edwards makes clear that the intentional relinquishment or abondonment of [a] known right or privilege is the requisite finding for waiver as opposed to the familiar `totality of circumstances' ordinarily employed."
The trial court then quoted from Edwards, 451 U.S. at 482,101 S.Ct. at 1881:
 "First, the Arizona Supreme Court applied an erroneous standard for determining waiver where the accused has specifically invoked his right to counsel. It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abondonment of a known right or privilege, a matter which depends in each case `upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'"
The trial court concluded that the appellant's statement was properly secured by Sgt. Kines, that appellant was properly advised of his rights and was repeatedly advised of his specific right to counsel, that appellant knowingly and intelligently relinquished his rights and made his statement without hope of reward or fear of reprisal.
The record supports the finding that the appellant was competent at the time he gave his confession and that he knowingly waived his right to counsel. In Magwood v. State, [Ms. 4 Div. 361, October 8, 1985] (Ala.Cr.App. 1985), the appellant claimed that he did not knowingly and voluntarily waive his rights. The officer who picked up the appellant "stated that he could smell alcohol on the appellant and he was slurring his words `just a little bit,' but he was not staggering drunk . . . further . . . appellant was not so intoxicated that he was unaware of what he was talking about."Id. "Where a suspect who is given a Miranda warning has been drinking, his confession is not thereby rendered inadmissible unless he is unconscious of the meaning of his words." Id. To render a confession inadmissible, intoxication must amount to "a `mania' which impairs the will and mind to the extent that the person confessing is unconscious of the meaning of his words." Boggan v. State, 455 So.2d 228, at 236, (Ala.Cr.App. 1984). As in Boggan, it has not been demonstrated that the appellant was so highly intoxicated as to be at a point of `mania.' Similarly, there was no showing in the present case that the appellant was so impaired as to be incapable of understanding the meaning of his words. The record is void of any indication that the trial court's findings were contrary to the weight of the evidence. Therefore, the appellant's argument must fail.
 III.
The appellant also argues that the trial court erred in admitting evidence by way of photographs of the victim's exposed scalp. He alleges that the photographs added nothing to the comprehension of the facts *Page 337 
allegedly before the jury. He maintains that the photographs did not shed any light on any issue of the case and that the photographs were only introduced to create prejudice against the appellant.
As the State correctly points out:
 "This identical issue was recently decided by this court in the case of Fike v. State, 447 So.2d 850
(Ala.Cr.App. 1983), wherein a victim's scalp was exposed to reveal skull fractures. In deciding this issue adversely to that Appellant's and this Appellant's position, this court held as follows:
 "`The appellant objects to the admission into evidence of certain photographs depicting the deceased's wounds. The photographs showed the deceased's exposed skull and depicted the fractures which had been inflicted to the victim's skull.
 "`While we admit these photographs were most unpleasant,
 "`"[t]he fact that a photograph is gruesome and ghastly is not reason for excluding it, if relevant, even if the photograph may tend to inflame the jury. Richards v. State, Ala. Cr. App., 337 So.2d 171, cert. denied, Ala., 337 So.2d 173
(1976)."'
 Carpenter v. State, 400 So.2d 417 (Ala.Cr.App. 1981); Cheatham v. State, 431 So.2d 1350
(Ala.Cr.App. 1983); Brodka v. State, 53 Ala. App. 125, 298 So.2d 55 (1974).
 "`". . . As a general rule photographs are admissible in evidence if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Thigpen v. State, 50 Ala. App. 187, 277 So.2d 922 (1973)."'
"Carpenter, supra; Cheatham, supra.
 "`The photographs at issue were used during the testimony of Dr. Henry Santina, who performed the autopsy on the deceased, to corroborate and illustrate his testimony concerning the location and extent of the deceased's injuries. The photographs were relevant evidence and thus, properly admissible for this purpose. McAdams v. State, 378 So.2d 1197 (Ala.Cr.App. 1979.)
 "`Furthermore, in the case the appellant cites for authority, McKee v. State, 33 Ala. App. 171, 31 So.2d 656 (1947), this court recognized the relevancy of photographs of the internal injuries of a deceased which allegedly caused the death. However, the court cautioned that a jury should not be exposed to such areas of photographs which are unreasonably gruesome and are not relevant to aid the jury in understanding the nature and gravity of the deceased's injuries.'"
 (State's brief, page 25, quoting Fike v. State, 447 So.2d at 859.)
The trial court, prior to deciding the issue now before this court, held a hearing outside the presence of the jury. Dr. Tift identified the photographs in question and, regarding the relevancy of the photographs, testified that the photographs were the only pictures that showed the skull fracture; that he would be unable to show those injuries without the scalp being pulled back; that this was the standard procedure utilized in examining head injuries; and that the only way to show them to the jury would be by way of photographs.
The doctor also testified regarding the skull fracture: that it was the internal examination of the victim's skull which revealed that the fracture to the skull had curved edges which indicated that a "relatively heavy object" was used to inflict the injuries; that the fractures were also very deep and the bone was driven into the head; that the photographs also revealed that the fractures were separate and distinct, *Page 338 
leading the doctor to believe that at least seven blows were inflicted upon the victim.
After hearing the aforementioned testimony elicited from Dr. Tift, the trial court allowed the introduction of the photographs in question. The trial court was in the best position to determine the relevancy of the photographs and their effect upon the jury, and its decision must be accorded great weight. We find no reason to overrule the trial court's decision.
The record is devoid of any errors injurious to the substantial rights of the appellant. Therefore, this judgment is due to be affirmed.
AFFIRMED.
All the Judges concur.
[1] Several Alabama cases address the proposition of law set out in Edwards v. Arizona, supra: Stahl v. State, 426 So.2d 909, (Ala.Cr.App. 1982); Chandler v. State, 426 So.2d 477
(Ala.Cr.App. 1982); Payne v. State, 424 So.2d 722 (Ala.Cr.App. 1982); Dunkins v. State, 437 So.2d 1349 (Ala.Cr.App. 1983);Moulds v. State, 429 So.2d 1176 (Ala.Cr.App. 1983); Hayes v.State, 443 So.2d 1323 (Ala.Cr.App. 1983); Fike v. State,447 So.2d 850 (Ala.Cr.App. 1983). However, in Zeigler v. State435 So.2d 156 (Ala.Cr.App. 1983) this court held that a defendant's exculpatory oral response to a question posed by police immediately after invoking his right to counsel was not sufficient to establish a valid waiver of these rights. In so doing, this court held that the defendant "did not initiate further communication, exchanges, or conversation with police officers, but simply responded to further police initiated custodial interrogation." *Page 592