WELCH, Judge.
The State of Alabama appeals from the trial court’s pretrial determination that Demetrius Raishad Watson was entitled to immunity from prosecution for the murder of Lisa Langston, a violation of § 13A-6-2(a)(1), Ala. Code 1975.
The pertinent facts are in the trial judge’s order set forth below. A summary of the facts discloses that at approximately 6;00 p.m. on December 5, 2013, Watson’s frightened female cousin, Datrial Allen-Cathey, summoned him to come to her home because a female stranger, the victim, Lisa Langston, appeared to be having some type of psychotic episode in Cathey’s yard. Watson, armed with a pistol, immediately went to Cathey’s residence, where he encountered Langston in the yard. He did not know Langston. Langston was foaming at the mouth and barking like a dog. She immediately accused Watson of killing her baby and charged toward him, exclaiming that she intended to kill him. Langston was “fidgeting” with something at her waist as she charged toward'Watson. Watson fired once into the ground to scare Langston, but she shouted that she was not afraid of guns and continued to rush toward Watson.' Watson fired a second time striking Langston in her arm. However, the bullet traveled into her body striking her lung. She died of the gunshot wound.
On May 8, 2014, Watson was indicted for Langston’s murder. On October 9, 2014, Watson filed a motion to dismiss the indictment, arguing that pursuant to § 13A-3—23(d), Ala. Code 1975, he was entitled to immunity from prosecution because his use of deadly physical force was justified under the circumstances and, thus, lawful. Section 13A-3-23, Ala. Code 1975, provides, in relevant part:
“(a) A person is justified in using physical force upon another person in order to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he or she may use a degree of force which he or she reasonably believes to be necessary for the purpose. A, person may use deadly physical force ... if the person reasonably believes that another person is:
“(1) Using or about' to use unlawful deadly physical force,
it -
“(3) Committing or about' to commit a[n] .,. assault in the first ór second degree ....

U

“(b) A person who is justified under subsection (a) in using physical force, including deadly physical force, and who is not engaged in an unlawful activity and, is in any place where he or she has the right to be has no |iuty to retreat and has the right to stand his or her ground.
“(c) Notwithstanding the provisions of subsection (a), a person is not justified in using physical force if:
“(1) With intent to cause physical injury or death to another person, he or she provoked the use of unlawful physical force by such other person,
“(2) He or she was the initial aggressor, except that his or her use of physical force upon another person under the circumstances is justifiable if he or she withdraws from the encounter and effectively communicates to the other person his or her intent to do so, but the latter person nevertheless continues or threatens the use of unlawful physical force.
“(3) The physical force involved was the product of a combat by agreement not specifically authorized by.law.
*499 “(d) A person who uses force, including deadly physical force, as justified and permitted in this section is immune from criminal prosecution and civil action for the use of such force, unless the force was determined to be unlawful.”
On October 6, 2015, a hearing was conducted on Watson’s request for immunity from prosecution, Following the hearing and the receipt of posthearing briefs, the trial court entered the following order granting Watson immunity from prosecution:
“This matter is before the Court on [Watson’s] Motion to Dismiss the Indictment pursuant to the provisions of Section 13A-3-23(d) of the Alabama Criminal Code. This Court conducted an evidentiary hearing on this motion on October 6, 2015. The following witnesses appeared before the court and.provided testimony in this matter: Joshua Watson, Datrial Allen-Cathey, Demetrius Watson, [and] Shelby County Deputy Sheriff John Shearon. Having considered the pleadings, the testimony of witnesses presented by the State of Alabama and [Watson] defendant, the evidence presented during the hearing, together with the argument of counsel and the briefs submitted by the parties, the Court makes the following findings of facts and conclusions of law:
“FINDINGS OF FACTS
“First, this Honorable Court heard the testimony of Mr. Joshua Watson, the brother of Demetrius Watson. Joshua testified that on the night of December 5, 2013, he, along with his girlfriend, was traveling down Highway 31 in Calera, AL when they observed a train stopped at the entrance of Slab Hill Road. Joshua testified that [he] observed an unknown woman, later identified to be Mrs. Lisa Langston, pulled over on the side of the road (at the intersection of Highway 31 and Slab- Hill Road). As he drove closer to Mrs. Langston’s truck, Joshua testified that it appeared she was beating something in the back of the truck. Joshua testified that he proceeded to turn onto 'Slab Hill Road and observed Mrs. Langston hysterically screaming for someone named Haley and acting very erratic. Joshua testified that while he attempted to speak to Mrs. Langston, she acted as if she never saw him and appeared to ‘stare right through him.’ Joshua then observed Mrs. Langston leave her truck (with the driver side door still open) and head to the stopped train. Joshua then testified that he observed Mrs. Langston crawl underneath the train, stumble several times, and then proceed down Slab Hill Road toward his families’ property. Out of concern for the safety of his family, including several young children who often play outside, Joshua testified that he contacted his family by phone and to warn them and described Mrs. Lang-ston’s erratic behavior.
“Moments later, and almost 600 feet from the stopped train, Mrs. Langston arrived at the doorstep of Mrs. Datrial Allen-Cathey, the cousin of [Watson]. Mrs. Cathey testified that she had just returned home from a chemotherapy appointment and that it had started to turn dark. Mrs. Cathey testified that [she], her three children (ages 13, 11, and 8), Melissa Thomas and Connie Baker, were at home when they heard noise and loud knocks on the door. Ms. Cathey testified that she and Ms. Thomas went to the door and observed Mrs. Langston acting alarmingly erratic and repeatedly screaming that ‘[her] husband killed [her] daughter’ and .that her daughter was hung in a tree.behind Mrs.-Cathey’s house.
*500 ..“Mrs. Cathey testified that because they could not calm Mrs. Langston down and that her behavior was. frightening her and her children, she called [Watson] and told him to come and help immediately. Mrs. Cathey testified that once [Watson] arrived, Mrs. Langston took off after him while hysterically screaming, “You killed my baby, you killed my baby.’ Ms. Cathey also testified that, at one point, [Mrs. Langston] broke through a wooden fence in order to charge towards [Watson]. She testified that [Watson] attempted numerous times to calm Mrs. Langston down, but to no avail. At this time, Mrs. Cathey called 911 and explained to the dispatcher that an unknown woman was at her house, going crazy, rolling around in the yard, scaring her and her kids, and yelling that her husband had killed her daughter. While still on the phone with the 911 dispatcher, Mrs. Cathey observed Mrs. Langston charge at [Watson], Mrs. Cathey then testified that [Watson] fired a warning shot into the ground, but that Mrs. Langston kept advancing onto [Watson] and screamed, ‘I am not scared of any gun’ and continued rushing towards him. [Watson] then shot once more.
“[Watson] next testified. Upon arriving at Mrs. Cathey’s house, [Watson] testified that he observed an unknown woman foaming at' the mouth, on all fours, and constantly rolling back and forth on the ground. [Watson] testified that he repeatedly and calmly requested Mrs. Langston to leave their property numerous times, but that Mrs. Langston refused. Instead, Mrs. Langston began to hysterically scream at [Watson] that he was the one who, in fact, had killed her daughter and that she was going to kill him. Mrs. Langston then began to advance towards [Watson]. [Watson] testified that he immediately warned her that he was armed and to stop. Mrs. Langston disregarded this warning and kept charging towards • him. [Watson] then pulled out his pistol, -[for] which he has a valid permit, and fired a warning shot into the ground.
“However, in spite of this second warning to stop, Mrs.' Langston screamed that a gun did not scare her and kept advancing towards [Watson] while still threatening to kill him. Mrs. Langston was fidgeting around her waist with her hands. Mrs. Langston then attempted to attack [Watson]. Due to Mrs. Langston’s constant fidgeting around her waist as well ■ as it being dark, [Watson] testified that he had no way of knowing if Mrs. Langston had a weapon. At this time, [Watson] testified that he fired an additional shot in order to protect himself and his family. The 911 tape shows that.within three sec- ’ onds or so from the warning shot, [Watson] fired this second shot hitting her in the arm.
“[Watson] testified that he immediately told everyone to get inside. He then took the phone from Mrs. Cathey in order to speak to the 911 dispatcher. During this conversation as well as the ensuing interview with the lead detective, [Watson] explained that Mrs. Lang-ston threatened to kill him, initially grabbed him, and kept coming at him. [Watson] testified that he was scared for his life and that he had no , other choice as it was necessary in order to protect himself and his family.
“Sheriff John Shear on, the lead detective on the case, testified in response to a question posed by [Watson’s] attorney that he had nothing to dispute that [Watson] feared for his life and that he was acting in self-defense at the time of the incident.
*501 “Included in the exhibits provided to this Court were the psychiatric records of Mrs. Lisa Langston, an autopsy report, and toxicology report. Found within these records are proof that Mrs. Langston had been previously diagnosed with a bi-polar disorder as well as depression and that she was currently prescribed numerous medications in order to curb the effects of this disorder. The autopsy report showed that the time of Mrs. Langston’s death, she was approximately 5'2" and weighed 172 lbs. The toxicology reports showed the following medications found in Mrs. Langston’s system, (1) Doxepin; (2) Xanax; (3) Se-roquel; and (4) Bupropion. In addition to this medication, Mrs. Langston had a 0.18 BAC[, blood alcohol content,] at the time of her death.
“LEGAL ANALYSIS
“In 2005, the Florida State Legislature passed what has become known as the ‘Stand-your-Ground’ law. Approximately twenty-four (24) states have followed the lead of Florida in passing similar laws. In 2006, Alabama became one of these twenty-four states when the new self-defense law took effect, creating a presumption that citizens are justified in using self-defense when they believe someone has unlawfully entered their dwelling, as well as authorizing citizens to stand their ground when attacked anywhere outside the home where they have a right to be.
“The amended Alabama Code Sections dealing with self-defense essentially changed the law in three major ways.
“1) A presumption was created for a person, using deadly force who has a reasonable belief that another person is: (a) using or about to use unlawful deadly physical force; (b) using or about to use physical force against an occupant of a dwelling while committing or attempting to commit a burglary of such dwelling, (c) committing or about to commit a kidnapping in any degree, assault in the first or second degree, burglary in any degree, robbery in any degree, forcible rape, or forcible sodomy. See § 13A-3-23(a), Ala. Code 1975;
“2) A person attacked where he or she has a right to be and who is not engaged in an unlawful activity may ‘stand his or her ground’ and use deadly force without any duty to retreat. See § 13A-3-23(b), Ala. Code 1975; and
“3) A person employing the use of deadly force in self-defense or as justified by law is now immune from criminal prosecution or civil liability and should not be arrested absent a determination that the force used was unlawful. See §§ 13A-3-23(d) & (e), Ala. Code 1975.
“Therefore, a person meeting the requirements of Ala. Code [1975,] § 13A-3—23(a), is exempt and free from the burden of criminal prosecution or civil litigation. Accordingly, Ala. Code [1975,] § 13A-3-23(d), provides not just a defense at trial but a bar to trial. This Court has found one Alabama case concerning the processes and procedures for invoking and adjudicating such statutory immunity. State of Alabama v. Robert Allen Carleton, 114 So.3d 165 (Ala.Crim.App.2011) (affirmed without opinion). Additionally, the Court has also looked at other jurisdictions for guidance. Multiple state appellate courts, from jurisdictions with similar copycat ‘Stand-your-Ground’ legislation, have addressed similar statutory silence and have judicially established certain procedures. Each state appellate court, which has reviewed and addressed ‘Stand-your-Ground’ -type immunity claims, has *502 determined that the accused has a right to a pre-trial evidentiary hearing to adjudicate the accused[’s] entitlement to the statutory immunity. This Court has relied upon the legal analysis of other jurisdictions-in establishing the procedure utilized by the Court in this case.
“Colorado appellate courts were the first to address the entitlement to a hearing and the procedures thereto. In People v. Guenther, 740 P.2d 971, 975 (Colo.1987), interpreting their ‘Stand-your-Ground’ statute, the Supreme Court of Colorado found as follows: ‘In accordance with the plain meaning of these terms, the phrase “shall be immune from 'criminal prosecution” can only be construed to mean that the statute was intended to bar criminal proceedings against a person for the use of force under the circumstances set forth in subsection (2) of section 18-1-704.5.’ In the silence of statutorily delineated procedures, that Guenther Court proceeded to find that their ‘Stand-your-Ground’ statute: confers authority on a court to conduct a pretrial hearing on whether the statutory conditions-for immunity from prosecution have been established and, if so established, to dismiss the criminal charges.
“Following the reasoning of the Guen-ther Court, the’ District Court of Appeals of Florida also found the right of the accused to an evidentiary pre-trial hearing on the claims of statutory immunity, pursuant to the Florida ‘Stand-your-Ground’ law. After analyzing their ‘Stand-your-Ground’ statute, this Florida intermediate appellate court declared: ‘[T]he wording selected by our Legislature makes clear that it intended to establish a true immunity and not merely. an affirmative defense.’ Peterson v. State, 983 So.2d 27, 29 (Fla.Dist.Ct.App.2008). Therefore, the Court held, ‘[[likewise, we hold that a defendant may raise the question- of statutory immunity pretrial and, when such a claim is raised, the trial court must determine whether [Watson] has shown by a preponderance of the evidence that the immunity attaches.’ Id. These Courts imposed the same burden of proof as [they] would in motions for post-conviction relief or motions to suppress. Id. See also McDaniel v. Florida, 24 So.3d 654 (2010); Horn v. Florida, 17 So.3d 836 (2009). Based upon the witness testimony and the evidence offered during the evidentiary hearing, as well as all of the above, this Court makes the following findings of fact and conclusions of law:
“1. The events of December 5, 2013, occurred in an isolated neighborhood in rural Shelby County, in the dark of night, and after [Watson received] a call from his brother about an erratically behaving woman approaching his property.
“2. [Watson] encountered an unknown woman on all fours, rolling around on the ground, and acting very erratie[ally].
“3. [Watson] calmly and repeatedly tried to get the woman to leave the property without success.
' “4. The woman rushed towards [Watson] screaming that 'she was going to kill him.
“5. [Watson] was in possession of his gun, which he has a license to carry, for his safety as well as his family’s, safety.
“6. [Watson] warned the woman that he was armed and [that] she needed to stop.
“7. She refused and instead threatened to kill him and charged toward him.
“8. She continued to aggressively approach him and threatened to kill *503 [Watson] even after he fired a warning shot towards the ground.
■ “9. Scared for his life as well as his family’s, [Watson] had to make a split-second decision and fired a second shot at her.
“10. [Watson] testified -dearly he had no other choice.
“11. [Watson] had no criminal history and was honorably discharged from the Marines.
“12. There was no evidence that [Watson] had any animosity toward Ms. Langston [and] that he was motivated by anything other than reasonable fear of serious bodily harm to himself or others present.
“It is this Court’s findings that [Watson] reasonably perceived that this could have resulted in great bodily harm or death to him or a family member. For this reason, [Watson’s] use of force is protected and immunized by the statute as he had the right to .be present; was free from fault, and had the right to defend himself and others from serious bodily harm or death.
“The Court finds by a preponderance of the evidence, that [Watson] has met his burden of proving that he is entitled to the immunity provisions of Alabama Code 13A-3-23(d) and (e).
“THEREFORE, IT IS ORDERED AND DECREED [Watson’s] Motion to Dismiss the indictment is hereby granted and the indictment is hereby dismissed with prejudice.”
(Capitalization in original.)(Vol. 1, CR. 145-153.)
On November 19, 2015, the State filed a notice of appeal. See Rule 15.’7, Ala. R. Crim. P. (regarding' a pretrial appeal by the State).
The State contends bn appeal, as it did in its posthearing brief to the circuit court, that there was insufficient evidence 'presented at the immunity hearing⅛to establish by a preponderance of the evidence that Watson was justified in using deadly force.[1] The State asserts that- “[although the circumstances [2] faced by Watson were disturbing, the evidence at the pretrial immunity hearing failed to establish that his use of deadly force., against Lisa Langston was justified.” (State’s brief, p. 11.) Moreover, the State contends that the evidence was insufficient because Watson was armed with a pistol when he approached Langston; thus, the State argues, he was not free from fault in creating a dangerous situation and cannot prevail on an. assertion that he acted in self-defense. The State further contends that the evidence was insufficient because Watson had no reason to suspect that Langston possessed a deadly weapon; thus, his use of a deadly weapon was not justified. Finally, the State argues that the evidence was insufficient because, it argues, Watson claimed both that the shooting was an unintentional accident and that it was an intentional act of self-defense. The State asserts that the two defenses cannot coexist.[3]
*504 “ “When evidence is presented ore ten-us to the trial court, the court’s findings of fact based on that evidence are presumed to be correct,’ Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994); ‘[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,’ Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986); and we make ‘ “all the reasonable inferences and credibility choices supportive of the decision of the trial court.”’ Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting Bradley, 494 So.2d at 761.”
State v. Hargett, 935 So.2d 1200, 1203 (Ala.Crim.App.2005).
Contrary to the State’s assertion, the record validates the trial court’s finding that the preponderance of the evidence was in favor of granting Watson immunity from prosecution. “Under the ore tenus rule, the trial court’s findings of fact are presumed correct and will not be disturbed on appeal unless these findings are ‘plainly or palpably wrong or against the preponderance of the evidence.’ ” Shealy v. Golden, 897 So.2d 268, 271 (Ala.2004)(quoting Ex parte Cater, 772 So.2d 1117, 1119 (Ala.2000)). The trial court’s factual findings in favor of Watson are supported by the record. “Absent a gross abuse of discretion, a trial court’s resolution of [conflicts in the testimony or credibility of witnesses] should not be reversed on appeal.” Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App.1993)(citations omitted). This Court can find nothing in the record to justify a reversal of the trial court’s ruling granting immunity and dismissing the indictment.[4]
Accordingly, the trial court’s judgment is affirmed.
AFFIRMED.
Windom, P.J., and Kellum, Burke, and Joiner, JJ., concur.

. Initially, the State contended on appeal that the trial court applied the wrong standard of proof. However, the State withdrew and abandoned that claim in its reply brief.

. The State asserts on appeal that Langston’s conduct was "obviously .., some kind of psychotic episode," but the State argues that her conduct did not place Watson in imminent peril, or pose a life-threatening risk to Watson or a threat of serious physical injury to Watson, and moreover, Watson did not know if Langston was armed with a deadly weapon. (State's brief, p. 14.).,

.Watson did not testify that firing the second gunshot was an unintentional accident. Watson testified that he deliberately fired the second shot because he “was just fearing for [his] life so [he] shot in [Langston’s] di *504 rection.” (Vol. 3, R. 60.) He testified regarding the second shot that he was ”[n]ot aiming, [he] just shot.” (Vol. 3, R. 60.) Watson stated that he was trying to shoot close to her and that the bullet striking her was a “mistake.” (Vol. 3, R. 61.) Watson did not defend the shooting on the ground that it was an accidental shooting.

. We note that the procedure used by the Shelby Circuit Court in this case is consistent with the procedure outlined by this Court in decisions such as Harrison v. State, 203 So.3d 126 (Ala.Crim.App.2015), and Malone v. State, 203 So. 3d 126 (Ala.Crim.App.2016), which were issued after the circuit court had issued its order dismissing the indictment in Watson’s case.