39 So.3d 214 (2009)
STATE of Alabama
v.
J.L.D.
CR-08-0458.
Court of Criminal Appeals of Alabama.
November 13, 2009.
*215 Troy King, atty. gen., and Marc Alan Starrett, asst. atty. gen., for appellant.
Benjamin E. Schoettker, Montgomery, for appellee.

On Return to Remand[*]
MAIN, Judge.
The State of Alabama appeals from the circuit court's decision to grant J.L.D.'s *216 pretrial motion to suppress cocaine seized by the police. See Rule 15.7, Ala. R.Crim.P. In its order granting the motion to suppress, the trial court referred to an earlier ruling granting the motion; however, this Court could find no such prior ruling by the trial court. Thus, we remanded this cause by order for the trial court to clarify its order granting the motion to suppress. The trial court was also ordered to make findings of fact and to submit reasons for its determination so that this Court could properly review its decision. See State v. Hargett, 935 So.2d 1200 (Ala.Crim.App.2005). The trial court has submitted its findings and reasons on return to remand; we now review the trial court's decision to grant the motion to suppress.
J.L.D. was charged with the unlawful possession of a controlled substance, in violation of § 13A-12-212(a)(1), Ala.Code 1975. He was also charged with failing to display lighted lamps and illuminating devices while operating a motor vehicle on public roadways or highways. (S.R. 5-6.)
A pretrial suppression hearing was held on July 17, 2008, at which the State presented the testimony of Officer Sam Brosius of the Autauga County Sheriff's Department. Officer Brosius testified that on July 27, 2007, he was working as an officer with the Montgomery Police Department and was driving the patrol car when he initiated a traffic stop of a Jeep brand sport utility vehicle driven by J.L.D. because there were "[n]o lights on the vehicle at all." (R. 4, 11.)[1] Officer Brosius testified that he "lit him up" as J.L.D. turned into the Peddler's Inn, but J.L.D. drove around the parking lot before coming to a stop.[2] Officer Brosius stated that he approached the driver's side where J.L.D. was seated; that another man was seated in the passenger's seat; and that J.L.D. "was moving around inside" and "fidgeting a little bit too much." (R. 5.) Officer Brosius further testified that J.L.D. was ordered to put his hands out, but refused; that he again ordered J.L.D. to do so, at which time he put his left hand out of the window then pulled it back inside. According to Officer Brosius, he again ordered J.L.D. at gunpoint, for safety reasons, to comply; that J.L.D. then put his hands out of the vehicle; that J.L.D. slid out of the driver's side and dropped a plastic bag on the ground; and that J.L.D. was not cooperative. He stated that as he gained control of J.L.D., "he was taking his right foot trying to kick the bag of white narcotics that I (Brosius) believed to be crack between my legs behind me . . . so I wouldn't see it." (R. 6.) Officer Brosius stated that he was watching J.L.D. kick at the bag as he attempted to handcuff him and that he clearly saw the bag, which contained three or four off-white rocks that he assumed to be cocaine; and that another bag was removed from J.L.D.'s pocket. Officer Brosius testified that he had "[n]o doubt in his mind at all" that J.L.D. dropped the bag with his right hand as he slid from the car and that he tried to kick it out of Officer Brosius's view with his right leg. (R. 8.)
On cross-examination, Officer Brosius stated that a camera man with the television show, MPD, was riding in the patrol car with his partner and him, and taping for an episode that had already aired at least once by the time of this hearing. (R. 8.) Officer Brosius recalled, on cross-examination after reviewing a report and refreshing *217 his memory, that J.L.D. exited the vehicle from the passenger's side, because the driver's side did not open. (R. 18.) Defense counsel also pointed out to Officer Brosius that his report and his affidavit did not mention that J.L.D. had kicked the bag between his legs. Officer Brosius testified on cross-examination that after he had taken the first bag containing the rocks from J.L.D., he had handcuffed J.L.D. and placed him in front of the patrol car; that he noticed that J.L.D. began moving around again; and that he therefore searched around and found another bag "underneath where his butt was right next to the front of" the patrol car. (R. 24.) This bag contained a larger off-white rock that also tested positive as cocaine. He stated that only approximately one minute had transpired between his finding these two bags. On redirect examination, Officer Brosius verified that he saw J.L.D. drop cocaine as he got out of his car. The State then rested.
J.L.D. was the only other witness at the hearing. He testified that the headlights were lit on the Jeep when he was pulled over by the patrol car at approximately 1:00 a.m.; that he pulled into the parking lot at the Peddler's Inn because he was staying there; that he did not notice any police car behind him until he was pulling into his parking spot, at which time he noticed two police cars behind him. J.L.D. testified that there was a black male in the passenger side of his vehicle, although Officer Brosius had testified that the passenger was white.[3] (R. 5, 21, 30.) J.L.D. stated that he was ordered to place his hands out of the window of his vehicle, and he complied; that he did not move or bring his hands back in the window; that the officer began yanking on the driver's door, ordering him to get out of the vehicle; that he informed the officers that the door would not open; and that he got out of the vehicle through the passenger's side. (R. 32.) He testified that he was then searched, handcuffed and sat down in front of the police car; he stated that the officers found nothing on him. (R. 32.) He testified that he did not drop anything as he exited the vehicle. J.L.D. admitted that he had drugs in his pocket, but he stated that the drugs were not found until after the officers had searched his car. On cross-examination, J.L.D. insisted that the only crack cocaine that he had on the night in question was in his pocket.
Following this testimony, defense counsel requested to make an argument, but the trial court responded, "I don't even need one, guys. If y'all arethat's kind of straight forward that the police officer definitely did what he was supposed to do and didn't do anything improper." (R. 44.) Defense counsel then stated that he would like to make an argument for the record in case the prosecutor might appeal and stated: "The basis of my argument is going to be that Mr. Brosius has testifiedOfficer Davis has testified that he took [J.L.D.] out of the vehicle for officer safety." (R. 45.) Defense counsel then argued, "I would like the trial court to consider making a ruling on this case so we can see if we can get the video." (R. 45.) The trial court responded that it did not "even need a video." (R. 45.) Defense counsel argued that the video might or might not corroborate J.L.D.'s version of the offense. The trial judge then stated that she found Officer Brosius's testimony to be "totally credible" while J.L.D.'s testimony was "not that credible." (R. 46.) Defense counsel excepted, noting the inconsistencies in Officer's *218 Brosius's testimony, arguing that the difference as to which hand held the drugs would be understandable, but not an entire scenario concerning dropping and kicking the drugs. The trial court stated that it disagreed. Defense counsel argued that because Officer Brosius stated that the only reason he had J.L.D. exit the vehicle after stopping him for driving without lights was for officer safety, the search went too far.[4] The trial court then stated that it had "absolutely no reason to think it happened any different" from the way that Officer Brosius testified because "he doesn't know the defendant, could care less." (R. 51.) However, as the trial court noted, J.L.D. "has every interest not to tell the truth because he is sitting here charged with a felony. So his recollection of how it happened could definitely be a little tainted." (R. 51.) Finally, defense counsel requested the videotape, stating that it would "clear the whole subject up. It makes [J.L.D.] out to be a liar or Mr. Brosius is not telling the truth. It's that simple." (R. 52.) The trial court then held that J.L.D. was entitled to the tape and the prosecutor noted that because MPD was a sort of news production both parties would have equal access to it. (R. 52-35.) Defense counsel stated that he would subpoena the videotape, but asked that the trial court watch it "and see who's telling the truth." (R. 53.) The trial court gave J.L.D. seven days to get the tape, and held that if the tape "shows something different, we can always open the suppression hearing back up. But right now I am denying your motion. If you watch it and find something enlightening on it" (R. 53-54.)
On September 11, 2008, the trial court held a second hearing on the motion to suppress. At that hearing, defense counsel informed the judge that he did not have any further questions to ask Officer Brosius, but he requested that the judge read the transcript from the previous hearing and watch the MPD video. The prosecutor also agreed that the court's decision would be based only on this evidence; however, because the videotape was not working, the prosecutor stated, "as far as admitting that into evidence, I don't know how that would work." (S.R. 3.) The trial court suggested that the prosecutor may want Officer Brosius to watch the entire tape and then question him; however, prior to the playing of the tape, Officer Brosius was asked whether the video "accurately portrays what it shows." (S.R. 5.) He acknowledged that it did but that there were several breaks or segments missing in the video. (S.R. 5.) He testified that he found cocaine "on the scene," and defense counsel stipulated that it was cocaine. (S.R. 6.) The trial judge then stated that she was "concerned" after watching the video, because "some of the testimony didn't match the video." (S.R. 7.) The following transpired during this second hearing:
"THE COURT: And what I was concerned about was, Deputy, some of the testimony didn't match the video. The one thing I was concerned about was and I'm going off memory. But I think you said he dropped whatever he had and he was trying to kick it under the car.
"THE WITNESS [Officer Brosius]: Yeah. That was in front of the patrol car. That wasn't part of that video.
"THE COURT: Okay. That's what I was saying because I was watching the *219 video and I was like where is that. So tell me about that. When did he kick it?
"THE WITNESS: The first bag waswell, you could see it clearly in the video where he throws it in the backseat as he's getting out.
"THE COURT: Right, right. And it looks like he dropped something.
"THE WITNESS: It was thatit was that clear baggy. That's why he got put in handcuffs. And from that point, I placed him in front of the patrol car.
"THE COURT: Right.
"THE WITNESS: And that's when he was trying to shove it up underneath the patrol car.
"THE COURT: Okay.
"[Defense counsel]: And, Judge, that's notand I don't want to be
"THE COURT: No. I'm going to go back and look at
"[Defense counsel]: I want you to because I'll tell you what I recollect the testimony to be. I saw what he did when he threw that in the back seat of the car, too.
"THE COURT: Right, I did, too. Because I thought the testimony was when he got out of the car
"[Defense counsel]: The testimony was
"THE COURT: he dropped it and was
"[Defense counsel]:that when he got out of the car
"THE COURT: trying to kick it under
"[Defense counsel]:he dropped it on the ground and he kicked it somewhere. And that was supposedly the cocaine.
"THE COURT: Right.
"[Defense counsel]: And then the testimony was that he was placed in handcuffs and he was put by the car.
"THE COURT: Right.
"[Defense counsel]: And then he was fidgeting and they found him [sic] either in his pocket or he dropped it right behind him, the marijuana that was found.
"THE COURT: Right.
"THE WITNESS: The marijuana was found in the front pocket. That wasn't evenI didn't even charge him for marijuana. That was found inI believe in his right-front pocket by Officer Bogan.
"THE COURT: And I just wanted
"THE WITNESS: And that's on the video.
"THE COURT: And I just wantand I'm going to go back and look at the transcript, but I just wanted to make sure. Deputy, because I thought the testimony was when hewe got him out of the car that he dropped it and was trying to kick something under the car. But you're saying that isn't your recollection of what you told me at the suppression hearing?
"THE WITNESS: Right. Well, the initial flag was when he threw in the backI observed him throw it in the back ofof his pickup truck. And then when he got out, then he started kicking it around and started throwing some, you know, other stuff all over the place.
"THE COURT: Okay.
"THE WITNESS: I mean, there was
"THE COURT: Okay.
"[Defense counsel]: And, Judge, my recollection is there was zero testimony about throwing something in the backseat. When I watched that video, I remember I said, well, I don't remember *220 nothing aboutI mean, I didn't know what that was until he just told me that's what that was just now because I didn't knowbecause I thought when I saw it, I wonder what that was.
"THE COURT: Yes.
"[Defense counsel]: So ...
"THE COURT: Right. And I'm going to go back and read the transcript. I'm just trying to make sure I'm clear. Okay. And I'm trying to think was thereI mean, I'm trying to go off memory because I've seen the video.
"I think that was it. I think that was it. So I'll go back and look at the transcript.
"[Prosecutor]: It showed the marijuana, but he wasn't charged with marijuana. It showed that on the video that was found in his pocket, that he admitted to.
"THE COURT: Right. And what I'll do, I'll watch that again and look at the transcript. Okay. And I think that's it.
"Did you have any questions, [defense counsel], for the deputy?
"[Defense counsel]: I'm just thinking back to the suppressionmy suppression argument more so than the trial because I made one argument during the suppression hearing based on what he said happened.
"THE COURT: Right.
"[Defense counsel]: Now he, in my opinion, is saying something else happened out there. And I'm just trying to think of
"(Brief interruption.)
"[Defense counsel]: And the video shows another thing, and I'm just trying toI'm just trying to think if what the facts are now, if that affects my argument as to the suppression or whether it would make a difference to this Court, whether or not
"THE COURT: And Iand I'm going to go
"[Defense counsel]: I don't think it does.
"THE COURT: I'm going to go look at that transcript we have for the suppression hearing, and I'll watch that again, too. And I think that was it.
"[Prosecutor]: Well, my officer is here to testify at the trial. I mean, if [defense counsel] wants to impeach him on something other than his memory
"THE COURT: Yes.
"[Prosecutor]: my officer is here to testify to what happened.
"THE COURT: Well, I mean, I'm going to watchyes, I'm going to
"[Defense counsel]: I'm saying I'm satisfied. I've got no questions for him. If you want to conduct a trial, you can ask him all you want. I'm just going to stand here is what I'm saying.
"THE COURT: And I'm fine. I'm fine. Okay. All right. Thank you. Deputy.
"[Prosecutor]: May he be excused?
"THE COURT: Yes. I appreciate it. Thank you."
(S.R. 7-12.)
Following this discussion, the hearing ended. On December 15, 2008, the trial court issued an order granting J.L.D.'s motion.
As is noted above, this Court remanded for the trial court to enter a new order clarifying its reasons for granting the motion and to make specific findings of fact. In its October 5, 2009, order on return to remand, the trial court complied with our instructions. The trial court specifically identified the basis for granting the motion as being the differences in Officer Brosius's testimony and what the videotape showed to have transpired. The court *221 provides a summary of the testimony from the hearing on the motion to suppress and then cites as discrepancies between the testimony and the videotape: "For instance, the video did not show the defendant dropping any bag and trying to kick it behind him nor did it show the defendant fidgeting or dropping anything in the backseat. The video also did not show the defendant sticking his hand out and then pulling it back inside the vehicle." Thus, the trial court concluded, Officer Brosius "was being less than truthful."
The DVD of the recording of the television show MPD depicting this offense was filed with this court, although the video was never admitted into evidence.[5] However, because of the importance placed on this recording by the trial court in making her decision to grant J.L.D.'s motion, the State moved this Court to accept the videotape under Rule 2(b), Ala.R.App.P. The State noted that the motion was not being submitted pursuant to Rule 10(g), Ala. R.App.P. because the parties had stipulated to the review of this tape by this Court on appeal. (State's Motion to Submit Video Recording in the Record on Appeal, pursuant to Stipulation of the Parties, p. 2.) This Court granted the State's motion by order on March 3, 2009, "because [J.L.D.] has no objection."
A review of the video, which lasts only approximately three minutes, shows Officer Brosius with his gun already drawn and pointed at the driver, ordering the driver of the vehicle to get out of the vehicle slowly and to keep his hands out of the window; Officer Brosius asks why the driver's door does not open, and the driver is ordered to remove his car keys with his right hand and drop them on the ground; Officer Brosius then tells Officer Brogan, who is positioned on the other side of the vehicle with his gun drawn toward the passenger, that he will have to get the men out of the vehicle. The driver pulls his hands back into the car and Officer Brosius points his gun at him and orders him to extend his hands back outside. The tape then contains Officer Brosius's instructions to the driver, stating, "Don't worry about whatever you dropped on the ground." The tape is cropped so that the camera is then positioned on the passenger's side of the vehicle and filming into the car so that the videotape shows the driver moving from his seat to the passenger's seat to get out of the vehicle. In doing so, the driver clearly throws a clear plastic baggie into the backseat. There is then a break in the video, after which the driver is shown handcuffed and being seated in front of the patrol car. Following another break in the filming, a baggie containing a white substance is shown on top of the hood of the patrol car. Officer Bogan is then shown searching the pocket of the driver's pants and withdrawing a large number of bills and a baggie containing what appears to be marijuana. Officer Bogan states that the vehicle was stopped for a traffic violation. Thereafter, "the driver starts shoving stuff down the side and that's when I [Officer Bogan] drew down on him for safety reasons to make sure he didn't have a weapon, and come to find out he had some crack cocaine." Another officer is shown inventorying the drugs that were found, according to him, predominately on the driver. The videotape then shows Officer Brosius preparing to see if the crack cocaine is "real."
"In reviewing a trial court's ruling on a motion to suppress, this Court reviews the trial court's findings of fact under an abuse-of-discretion standard of review.

*222 `When evidence is presented ore tenus to the trial court, the court's findings of fact based on that evidence are presumed to be correct,' Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994); `[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,' Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App. 1985), aff'd, 494 So.2d 772 (Ala.1986); and we make `"all the reasonable inferences and credibility choices supportive of the decision of the trial court."' Kennedy v. State, 640 So.2d 22, 26 (Ala. Crim.App.1993), quoting Bradley, 494 So.2d at 761. `[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court. . . . Absent a gross abuse of discretion, a trial court's resolution of [such] conflict[s] should not be reversed on appeal.' Sheely v. State, 629 So.2d 23, 29 (Ala. Crim.App.1993) (citations omitted). However, `"[w]here the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and the [appellate] Court will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court's application of the law to those facts."' State v. Hill, 690 So.2d 1201, 1203 (Ala.1996), quoting Stiles v. Brown, 380 So.2d 792, 794 (Ala.1980). `"`[W]hen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment.'"' Ex parte Jackson, 886 So.2d 155, 159 (Ala. 2004), quoting Hill, 690 So.2d at 1203, quoting in turn Ex parte Agee, 669 So.2d 102, 104 (Ala.1995). A trial court's ultimate legal conclusion on a motion to suppress based on a given set of facts is a question of law that is reviewed de novo on appeal. See State v. Smith, 785 So.2d 1169 (Ala.Crim.App.2000)."
State v. Hargett, 935 So.2d 1200, 1203-04 (Ala.Crim.App.2005).
It is clear from the trial court's statements that its decision to grant the motion to dismiss was based on the discrepancies in Officer Brosius's testimony at the first suppression hearing as compared to his subsequent testimony as well as to what is portrayed by the video tape. In State v. Mitchell, 722 So.2d 814 (Ala. Crim.App.1998), this Court addressed a similar situation wherein a police officer's testimony during the hearing on the motion to suppress differed from his previous accounts contained in his affidavit and a report. In Mitchell, the officer approached a vehicle that was parked in the middle of the road, which is a "crime," because he believed that a domestic-violence situation existed. Mitchell, 722 So.2d at 816. The officer testified at the hearing that he believed that Mitchell was intoxicated because he smelled of alcohol, was "glassy-eyed," and his speech was "very slurred"; the officer believed that Mitchell was intoxicated to the extent that he might "slip off into traffic." Id. The officer then testified at trial that Mitchell reached into his pocket and retrieved a couple of rocks of cocaine and dropped them, whereupon, because the officer attempted to grab them, a fight ensued. Mitchell, 722 So.2d at 816. During cross-examination at the hearing, the officer acknowledged that he did not include any of his testimony concerning Mitchell pulling the rocks of cocaine out of his pocket and throwing them on the ground or the skirmish that ensued in his affidavit, nor was it included in another officer's affidavit prepared based on the first officer's affidavit. Mitchell, 722 So.2d at 816-18. The trial court thereafter granted Mitchell's motion to suppress without making any findings of fact. Mitchell, 722 So.2d at 820. However, this Court found that despite any discrepancies in the officer's testimony, the *223 motion to suppress should not have been granted, stating:
"Although the trial court did not make specific findings of fact in support of its decision to grant the motion to suppress, we can infer from the record that the motion was granted because of the discrepancy between the testimony of Officer Tilley and the information contained in his report and the affidavit prepared by Investigator Greene regarding where the cocaine was located at the time of the search. We believe that the trial court's conclusion was erroneous.
"First, it appears that the trial court placed undue emphasis on Investigator Greene's affidavit and Officer Tilley's report. Tilley testified that he did not prepare the affidavit. Furthermore, he testified that the report he prepared, which was used by Greene to prepare the affidavit, was not a complete rendition of the facts. Thus, an argument can be made that the facts are not even in dispute; rather, the affidavit and the incident report are simply incomplete.
"Second, even if we were to assume that Officer Tilley found the crack cocaine only in the appellant's pocket and that the appellant did not, as Tilley testified, discard some of the crack cocaine, suppression of the cocaine was still not warranted. As discussed above, Officer Tilley was authorized to arrest the appellant for public intoxication; therefore, the subsequent search of the appellant's pocket was incident to a lawful arrest. Thus, it appears that under either fact scenariowhether some of the cocaine was discarded and some was found in the appellant's pocket or whether all of the cocaine was recovered from the appellant's pocketthe seizure of the cocaine was lawful."
State v. Mitchell, 722 So.2d at 822.
Similarly, in the present case, any discrepancies in Officer Brosius's testimony did not indicate that the seizure of the cocaine was not lawful. Here, J.L.D. was approached after being seen driving with no lights. If J.L.D.'s testimony was to be believed, he was staying at the Peddler's Inn, and he pulled in, not because he was being stopped, but because he was staying there. Officer Brosius was entitled to approach the vehicle because he and Officer Brogan stated that they saw J.L.D. driving a vehicle at night with no lights. J.L.D. admitted that crack cocaine was found in his pocket at the scene.(R. 40-41.)
We note that there is no indication on the videotape as to when in the course of the traffic stop the filming commenced. Therefore, any of Officer Brosius's testimony that concerned part of the res gestae occurring before the filming cannot be verified or discounted. Moreover, because the purpose of the videotape was to air as a television show, it had clearly been edited so that there are breaks in the tape. Regardless, the videotape portrays the driver in possession of a baggie containing a white substance that he throws into the backseat. He is also shown to have had a large number of bills and a baggie containing what appears to be marijuana in his pocket. Officer Brosius also refers to "whatever [the driver] dropped on the ground" in ordering him out of the vehicle.
Any discrepancies in Officer Brosius's testimony at the first hearing and his subsequent testimony as well as what the video portrays relate to lapses in memory or concern matters that do not affect the proof of the commission of the offense, but rather address the weight and credibility to be accorded to his testimony. Burks v. State, 689 So.2d 997, 998 (Ala.Crim.App. 1996) (despite conflicts in the evidence as to the testimony of undercover officers, their testimony proved a case of unlawful distribution of cocaine and "[a]ny discrepancies *224 in the testimony were matters of weight to be considered and determined by the trier of fact. Bland v. State, 601 So.2d 521, 524 (Ala.Cr.App.1992); Smith v. State, 583 So.2d 990 (Ala.Cr.App.), writ denied, 583 So.2d 993 (Ala.1991.)"). See also Arthur v. State, 711 So.2d 1031, 1054 (Ala. Crim.App.1996) (witness's admission to having given false testimony previously where there were discrepancies in prior and current testimony were matters to be considered by the jury concerning weight to be accorded the testimony but did not affect the witness's competency to testify). Whether the bag containing the crack cocaine was thrown out of the car and subsequently kicked by J.L.D. or whether it was thrown by him into the backseat, it was nonetheless in his possession, and he indicated guilty knowledge by attempting to discard it. The conflicts in the testimony did not concern an element of the offense or a matter essential to the proof of this offense. It should also be noted that there are a number of discrepancies between J.L.D.'s testimony and what the videotape depicts as well. He states on the tape that there were no drugs in the vehicle, and in his testimony states that no cocaine was found in the vehicle; however, the tape clearly shows him tossing the baggie with what he concedes tested positive to be cocaine into the backseat. He also testified that he never pulled his hands back into he car, but the video shows otherwise.
Although "any conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court", Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App.1993), because the evidence, even in light of the discrepancies in Officer Brosius's testimony, clearly supported a case of possession of cocaine, the trial court abused its discretion in granting J.L.D.'s motion to suppress. Therefore, the trial court's decision to grant the motion to suppress is due to be reversed and this cause is remanded to the trial court.
REVERSED AND REMANDED.
KELLUM, J., concurs.
WISE, P.J., concurs in the result, with opinion, joined by WINDOM, J.
WELCH, J., dissents, with opinion.
WISE, Presiding Judge, concurring in the result.
In this case, the main opinion reverses the trial court's order granting J.L.D.'s motion to suppress based on a finding that the evidence "clearly supported a case of possession of cocaine." 39 So.3d at 224. However, the issue in this case is not whether the evidence was sufficient to support a conviction for unlawful possession of a controlled substance. Rather, the issue is whether the trial court properly granted J.L.D.'s motion to suppress the drug evidence officers seized.
In this case, the trial court initially denied J.L.D.'s motion to suppress, and the record supported that ruling. Later, after reviewing a recording of part of the incident, the trial court changed its ruling and granted the motion to suppress based on differences between Brosius's testimony and the events depicted by the recording. As was the case in State v. Mitchell, supra, it appears that the trial court placed undue emphasis on the video recording. However, as the main opinion notes, the recording had clearly been edited for viewing, and the recording therefore did not depict the entirety of the incident about which Brosius testified.
Under these circumstances, I agree with the main opinion that any discrepancies between Brosius's testimony and the events depicted on the recording would go to the weight the jury would afford Brosius's *225 testimony rather than to the propriety of the trial court's ruling on the motion to suppress. I do not agree with the main opinion's decision to reverse the trial court's order based on a finding that the evidence "clearly supported a case of possession of cocaine." 39 So.3d at 224. Instead, I would reverse the trial court's order based on a finding that it abused its discretion in changing its initial decision to deny the motion to suppress solely because of perceived discrepancies between the testimony of Brosius and the events depicted on an admittedly edited video recording. Therefore, I respectfully concur in the result.
WINDOM, J., concurs.
WELCH, Judge, dissenting.
The main opinion correctly sets forth the relevant legal standards regarding appellate review of a trial court's ruling on a motion to suppress, but it has failed to apply those standards. Therefore, I dissent.
The trial court granted J.L.D.'s motion to suppress evidence seized following a traffic stop and, as the majority correctly notes, the trial court based its judgment on the testimony of Officer Brosius and J.L.D., and on its review of a videotape of a portion of the stop. The trial court stated that Officer Brosius was less than truthful and that his testimony of the events contained "many discrepancies" from what was depicted on the videotape. (October 7, 2009, trial court's return to remand.)
"The determination of the credibility and veracity of the witnesses and evidence is the responsibility of the trial court, not the appellate court." Ware v. State, 949 So.2d 169, 180 (Ala.Crim.App.2006). The main opinion acknowledges this rule of law but declines to apply it here. Instead, the main opinion states that "[t]he conflicts in the testimony did not concern an element of the offense or a matter essential to the proof of this offense," 39 So.3d at 224, that "[a]ny discrepancies in Officer Brosius's testimony at the first hearing and his subsequent testimony as well as what the video portrays relate to lapses in memory or concern matters that do not affect the proof of the commission of the offense, but rather address the weight and credibility to be accorded his testimony," 39 So.3d at 223, and it holds that "because the evidence, even in light of the discrepancies in Officer Brosius's testimony, clearly supported a case of possession of cocaine, the trial court abused its discretion in granting J.L.D.'s motion to suppress." 39 So.3d at 224. Finding that the evidence would be sufficient to prove J.L.D.'s guilt, the main opinion reverses the trial court's judgment. I find no legal support for the reversal and no reason to interfere with the credibility determinations the trial court made after observing the witnesses testify. The weight of the evidence against J.L.D. is an issue wholly separate from whether evidence was wrongfully obtained by the police. A violation of a defendant's constitutional rights is not somehow negated if the prosecution has a strong case against him.
The main opinion quotes and relies on State v. Mitchell, 722 So.2d 814 (Ala.Crim. App.1998), but that case is not dispositive. The trial court in Mitchell granted a defense motion to suppress cocaine seized following Mitchell's arrest on a charge of public intoxication. The police officer had initially stopped to investigate the situation because Mitchell and his companion had stopped their vehicle in the middle of a public roadway and had turned on the hazard lights. The officer learned that Mitchell and his companion had been arguing, and he saw Mitchell walk away from the vehicle and continue to walk near the edge of the road. An officer who arrived *226 to assist the responding officer testified that he observed Mitchell stumble a few times, smelled alcohol on Mitchell, and noticed that his speech was slurred. Mitchell was arrested for public intoxication, and at some time during this incidentthe evidence as to this point was unclearMitchell threw cocaine on the ground or it was found in his pocket, or perhaps both. Mitchell was subsequently charged with possession of that cocaine, and the trial court granted Mitchell's motion to suppress the cocaine. In reviewing the trial court's judgment, this Court inferred that the trial court had granted the motion because of the discrepancy in the arresting officer's explanations about whether the cocaine was found in Mitchell's pocket or whether Mitchell had thrown the cocaine on the ground. This Court determined that suppression was not warranted, in part, because Mitchell had been lawfully arrested for public intoxication and some of the cocaine would have been found in the search incident to that arrest.
Relying on this Court's holding in Mitchell, the main opinion states: "Officer Brosius was entitled to approach the vehicle because he and Officer Brogan stated that they saw J.L.D. driving a vehicle at night with no lights. J.L.D. admitted that crack cocaine was found in his pocket at the scene." 39 So.3d at 223. Notably absent from this case, unlike Mitchell, is a lawful arrest and subsequent search incident to that arrest that revealed the possession of cocaine. Therefore, unlike Mitchell, the discrepancies in the officer's testimony in this case that led the trial court to determine that the officer was not truthful undermined the legality of J.L.D.'s seizure and the discovery of the cocaine. Therefore, the trial court's assessment of the officer's credibility was crucial to a determination of whether the cocaine was due to be suppressed. It is that very crucial assessment, made by the judge who observed the witnesses and who was in a far better position to make that determination, that the main opinion casts aside based on its own weighing of the testimony from Officer Brosius and from J.L.D. and from its consideration of the videotape. An appellate court is not in a position to make these vital credibility determinations, and the main opinion errs in doing so.
A trial court is vested with the determination of the facts in a hearing on a motion to suppress. An experienced trial judge is in a position to see whether the witness testified forthrightly or hesitatingly; the expression on the witness's face; whether the witness looked to the attorney calling him for help when asked a difficult question; whether the witness's gestures indicated deception or honesty; whether the direction of the witness's gaze was appropriate to indicate that he was recalling a remembered fact or creating a response. I have no opinion about whether the witness testified falsely or not; it is not my business as an appellate judge to form that opinion. This court cannot read a cold transcript and make credibility decisions. That function is properly placed in our trial judges.
I believe that the majority has usurped the role of the trial court and that the trial court's order granting the motion to suppress should be affirmed. There is no evidence in the record indicating that the court abused its discretion.
For the foregoing reasons, I respectfully dissent.
NOTES
[*] Note from the reporter of decisions: On August 25, 2009, the Court of Criminal Appeals remanded this case to the trial court by order.
[1] Officer Brosius later testified that he later saw the brakes work, but the headlights and taillights were not lit. (R. 11.)
[2] Officer Brosius testified that he wrote J.L.D. a ticket for improper taillights. (R. 4, 10, 38-39.)
[3] The video recording of this offense shows the passenger briefly, and he appears to be white.
[4] Although J.L.D. testified that his lights were working, his argument did not concern the initial stop, but rather the search and seizure.
[5] Although the recording was presented as a videotape during the proceedings, it was filed with this Court in DVD format; however, for consistency, we will refer to it as a videotape.